IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **TOMMY L. McCABE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No. 14-cv-943-CJP**[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### **MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Tommy L. McCabe seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

### **Procedural History**

Plaintiff applied for benefits in May, 2005, alleging disability beginning on April 27, 2005. (Tr. 13). An ALJ denied his application in July, 2008. (Tr. 13-20). After exhausting administrative remedies, plaintiff sought judicial review. The Central District of Illinois ordered the case remanded to the agency for further Proceedings. (Tr. 385-392). The case was then assigned to ALJ Stuart T. Janney.

After holding an evidentiary hearing, ALJ Janney denied the application on

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 23.

May 22, 2012.  (Tr. 368-383).   The Appeals Council denied review, and the decision of the ALJ became the final agency decision.  (Tr. 354).   Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### Issues Raised by Plaintiff

Plaintiff raises the following points:

1.      The ALJ erred in determining that plaintiff did not meet or equal Listing 12.05B or 12.05C.

2.      The ALJ erred in determining that plaintiff did not meet or equal Listing 1.04A.

3.      The credibility determination was erroneous.

4.      The ALJ erred in weighing the opinion of an examining psychologist.

5.      The ALJ's finding that there are jobs that plaintiff is able to perform was erroneous.

### Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

_____

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of

3

performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.   *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).   See also, *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Mr. McCabe was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

ALJ Janney followed the five-step analytical framework described above. He determined that plaintiff had not engaged in substantial gainful employment since the alleged onset date, and that he was insured for DIB through June 30, 2005.[3]   He found that plaintiff had severe impairments of disorders of the spine with lumbar radiculopathy; coronary artery disease with obesity, hypertension and hyperlipidemia; organic mental disorders including learning disorder; borderline intellectual functioning; ADHD; and affective disorders.   He further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the sedentary exertional level, with a number of physical and mental limitations.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past relevant work.   He was, however, not

---

[3] The date last insured is relevant only to the claim for DIB, and not to the claim for SSI.

disabled because he was able to do other jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1.   Agency Forms

Plaintiff was born in 1965, and was almost 40 years old on the alleged onset date. (Tr. 454).   He was 47 years old on the date that ALJ Janney denied his application.   He alleged that he was unable to work because of low back and knee pain, along with upper chest pain resulting from an arrow wound.   (Tr. 459).

Plaintiff submitted a report in September 2005 in which he said he had numbness in his hands, severe pain in his knees and back pain.   He had been treated at a hospital in Wichita, Kansas, in 1996 for a "broken back."   He had not seen a doctor recently because he had no insurance.   He took ibuprofen for pain. He said he thought he had nerve damage "from being shot with a bow & arrow in my neck."   (Tr. 104-110).

In a report submitted before the first denial of his application, plaintiff stated that he stopped working on April 27, 2005, because he "just can't do it anymore." (Tr. 118).   He said he worked as a carpet installer from 1998 to April 2005.   (Tr. 119).

Mr. McCabe said that he completed the 9th grade and he attended school at

the Treatment and Learning Center in Mattoon, Illinois.   He was in special education classes in an ADHD program.   (Tr. 122).

Plaintiff worked in the past as a carpet installer, a machine operator and a maintenance worker in a factory.   He worked as a carpet installer from 1998 to 2005.   (Tr. 460).

Plaintiff submitted a Function Report in July 2009.   His wife filled out the form for him.   The form stated that he lived with his wife and stepdaughter, and his wife did all of the household chores.   He mostly watched TV and slept off and on through the day.   His wife stated that he had problems getting along with people because he was "very set in his ways and he's grouchy."   She also stated that plaintiff "can not read or write."   She noted that he had recently gotten a medical card.   (Tr. 466-473).

### 2.   Evidentiary Hearings

At the first hearing in June 2008, plaintiff testified that he went to school through the 8th grade, but he only had a 2nd or 3rd grade education.   He said he could read and write "very little."   (Tr. 323).   He had very little medical treatment because he had no insurance and could not afford treatment.   (Tr. 335-336).

After his case was remanded to the agency, ALJ Janney held an evidentiary hearing on March 13, 2012.   Plaintiff was represented by counsel.   (Tr. 923).

Mr. McCabe testified that he finished the 8th grade, but really had only a 3rd or 4th grade education.   He was in special education classes.   (Tr. 928-929).   He had problems in reading and math.   He was put in a school called TLC.   The school was trying to get him up to a 10th grade level, but he was there for 4 years

and did not improve even a grade and a half.   He still had trouble reading and was "not real good at math."   He was taught to read a tape measure when he was laying floors.   (950-951).

Plaintiff had gained about 60 pounds since 2005 because he was unable to get up and move around.   He lived with his wife, who was paid through the Department of Rehabilitation Services as a personal assistant.   He had gotten a medical card about 4 years earlier.   (Tr. 930-931).   He said that he sometimes had pain shooting down his left leg, but did not have it in the right leg.   He used a cane while walking for stability.   He sometimes got numbness going into his arms and hands.   (Tr. 942-943).

Mr. McCabe testified that he had back pain since a car accident in 1998. He was taking hydrocodone for pain and Xanax to help him sleep.   (Tr. 940).   He said that he had problems with his knees.   He said that a doctor had told him that x-rays showed that his right kneecap had only "about a half-inch left" and that it was cracked all the way through.   (Tr. 953-954).

Plaintiff's boss at his carpet installation job was a friend.   He got to the point where he could no longer do the job.   It took him a lot longer to finish jobs.   His boss kept him working the last year only because they were friends.   (Tr. 955-956).

Plaintiff testified that his wife did everything around the house.   He did no chores of any kind.   He spent most of his time in a recliner.   He did not shop for groceries or cook.   (Tr. 958-960).

Mr. McCabe testified that, at one point, he tried to drill a hole in a wall so his wife could hang a walk rail for her client.   He dropped the drill because his hands

were numb and it drilled all the way through his foot and into the floor.   He said that he still had a scar on his foot.   (Tr. 966).

Plaintiff had 2 heart attacks in the weeks before the hearing.   Since then, he had no energy to do anything.   He was to be on "bed rest" for 3 weeks and then do physical therapy.   (Tr. 967-968).

A vocational expert (VE) also testified.   The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the sedentary exertional level, except that he could frequently lift up to 20 pounds and occasionally lift up to 50 pounds.[4]   He was able to sit for 8 hours, stand for 1 hour at a time and for a total of 2 hours a day, and walk for a total of 1 hour a day.   He was limited to frequent reaching, handling, fingering and feeling; no operation of foot controls with the right leg and occasional operation of foot controls with the left leg; no climbing of ramps, stairs, ladders, ropes or scaffolding; no crawling; and occasional balancing, stooping, kneeling and crouching.   He was further limited to work involving rote or routine instructions and involving little change in terms of tools, processes, or setting, and change must be introduced gradually.

The VE testified that this person could not do plaintiff's past work. However, he could do other jobs in the national and regional economy.   Examples of such jobs are hand packer, production worker assembler, and surveillance system monitor.   (Tr. 976-978).

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools."   20 C.F.R. §404.1567(a).

### 3.   Medical Treatment

Mr. McCabe was admitted to a hospital in Wichita, Kansas, in February 1996 following an automobile accident.   He suffered a compression fracture at T12-L1. This was treated with a brace.   (Tr. 174-175).   The fracture was described as "minimal anterior wedging" in the x-ray report.   (Tr. 176).   He was involved in another automobile accident in March 1998.   (Tr. 185).   A chiropractor diagnosed cervical strain/strain, post traumatic headaches and hyperflexion/hyperextension of the thoracic spine.   (Tr. 201-204).

In August 2003, plaintiff shot himself in the chest with an arrow.   He was intoxicated at the time.   The arrow entered the left lower chest, exited the left upper chest and lodged into the left side of the neck.   His wounds were sutured in an emergency room.   (Tr. 242, 295).

On June 20, 2005, Dr. Hima Atluri performed a consultative examination. Dr. Atluri concluded that plaintiff had "significant" problems in both knees which looked like "prepatellar bursitis with a lot of effusion in the joint."   He had "significant tenderness just by touching the knee."   (Tr. 147-151).

Plaintiff saw Dr. Brent Miller for headaches in January 2008.   (Tr. 300).

In May 2008, plaintiff went to the emergency room at Sarah Bush Lincoln Health Center in Mattoon, Illinois, for low back pain shooting down his legs.   He said he had symptoms "for years" but had progressively gotten worse over the past few days.   X-rays showed no acute injury.   On exam, straight leg raising was negative and sensory and motor functions were normal.   He was prescribed Lorcet to take as needed for pain.   (Tr. 302).

10

Dr. Vittal Chapa performed a consultative physical examination in July 2009.   Plaintiff told him that he had back pain which radiated down his right leg. He had not had any recent medical workup.   He was taking hydrocodone for pain. He was walking with a cane and trying not to put weight on his right leg.   On exam, there was no paravertebral muscle spasm, no motor weakness and no muscle atrophy.   Plaintiff said he could not feel pinprick sensation in his right leg.   Knee and ankle reflexes were absent on both sides.   Straight leg raising was negative in the sitting position, but was positive on the right in the supine position at 30 degrees.   Dr. Chapa noted that these results were "inconsistent."   Lumbosacral spine flexion was subjectively limited.   Dr. Chapa noted that his prior thoracic fractures "should not be causing the low back pain."   An x-ray of the lumbar spine showed multi-level degenerative disease in thoracolumbar junction and in the lower lumbar segments, but no obvious acute bony pathology.   (Tr. 581-587).

Plaintiff was seen in the emergency room for back pain radiating into his right calf in December 2009.   He had fallen off a porch 4 months prior.   On exam, there was muscle tenderness of the right low back without bony tenderness. Straight leg raising was negative on the right and positive on the left.   He was prescribed Norco, Valium and Prednisone, and discharged.   (Tr. 599).

Dr. Ghalambor, a pain specialist, saw plaintiff in late 2009.   He was referred by his primary care provider, Dr. Tan.   He complained of pain in the low back radiating into the right leg.   Dr. Ghalambor noted muscle spasms in the neck and tenderness over the bilateral paravertebral lumbar region.   Straight leg raising was positive at 10 degrees on the right and negative on the left.   He walked with an

11

antalgic gait, favoring the left leg.   (Tr. 629-630).   A CT scan of the lumber spine was done on October 31, 2009.   This showed minimal to moderate osteoarthritic changes in the dorsolumbar spine and mild bulging at L4-5.   There was no disc protrusion and the vertebral heights were well-maintained with no compression abnormalities.   A CT scan of the cervical spine showed no significant degenerative changes and no compression abnormalities.   The spinal cord was unremarkable. (Tr. 627-628).

Dr. Ghalambor gave plaintiff an epidural steroid injection at L4-5.   (Tr. 622-624).   He performed cervical facet medial branch blocks in December 2009. This did not give him significant relief.   Plaintiff complained of increased left sided cervical pain since the injection.   On exam, he had tenderness and reduced range of motion of the cervical spine on the left side.   He was neurologically intact in both upper extremities.   A repeat cervical CT scan was described as "unremarkable." (Tr. 610-621).

Plaintiff called Dr. Tan's office (Weber Clinic) in October 2009 requesting pain medication.   He was informed that Dr. Tan does not give pain medication and he may need to contact Dr. Ghalambor to see a doctor who does.   (Tr. 683).

Dr. Ghalambor administered an interlaminar epidural steroid injection at C5-6 on December 29, 2009.   (Tr. 606-607).   Plaintiff returned on January 21, 2010, complaining of worsening neck pain with weakness and numbness in the entire left upper extremity.   The doctor again noted that his cervical CT scan had been unremarkable.   On exam, hand grip was 4/5 on the left.   Sensory exam showed decreased sensation in the left upper extremity, "per report," in the C5-6-7

12

dermatomes.   Dr. Ghalambor noted that the examination 'was complicated by patient's significant pain behavior and possibly lack of effort and [sic] performing motor exam of the entire left upper extremity." He also stated that "the neurological findings do not correspond to any dermatome or nerve root and the last CT scan of the cervical spine could not explain his symptoms." He recommended an emergency MRI of the cervical spine and nerve conduction studies of the left upper extremity.   (Tr. 600-601).

Dr. William Olivero, a spine specialist, saw plaintiff in January 2010.   Dr. Olivero noted an "essentially normal neurological examination, with the exception of stocking sensory loss in the right leg."   He noted that cervical and lumbar CT scans were "essentially unremarkable" that plaintiff had been unable to undergo an MRI because he was claustrophobic.   He said he did not "see a surgically remedial problem."   (Tr. 634).

Plaintiff began seeing Dr. Gomendoza at Weber Clinic as his primary care physician in January 2010.   (Tr. 683).

Dr. Mark Stern saw plaintiff on referral from Dr. Gomendoza in February 2010.   Plaintiff had a positive rheumatoid factor, but it did not seem to correlate with rheumatoid arthritis or Sjogren's syndrome.   Dr. Stern informed Dr. Gomendoza that plaintiff was taking four NSAID drugs and four muscle relaxers in addition to pain medication and prednisone.   He recommended that plaintiff check with Dr. Gomendoza regarding cutting down these medications.   (Tr. 636).

Dr. Ketan Vyas performed a consultative physical exam on May 13, 2010. He noted that plaintiff had not had an MRI.   The range of motion of plaintiff's

cervical spine was normal and there was no tenderness in the neck.   Flexion of the lumbosacral spine was limited to 30 degrees.   Straight leg raising was positive on both sides in the sitting position, and plaintiff could not do straight leg raising in the supine position.   Motor strength and sensation were normal except for mild weakness during dorsiflexion of the right ankle.   He had normal ability to grasp and manipulate objects.   His gait was non-antalgic without the use of an assistive device.   Mental status examination showed that plaintiff was able to relate his medical history without apparent cognitive difficulties.   He was able to do simple calculations.   The assessment was subjective back pain.   Dr. Vyas noted that his CT scans showed no significant abnormality.   He also complained of neck pain, but he had a normal range of motion of the neck with no clinical sign of radiculopathy.   He was taking Lexapro for depression.   (Tr. 645-646).

On May 17, 2010, EMG and nerve conduction studies showed evidence of right L5 radiculopathy which was chronic in nature.   The studies did not show any evidence of neuropathy in either leg, radiculopathy in either arm, carpal tunnel syndrome or ulnar neuropathy.   (Tr. 785-788).

Jack Cole, Ph.D., performed a consultative psychological exam on May 26, 2010.   Plaintiff reported that he left school in the 8th grade at the age of 16.   He was put in special education classes in the 5th grade.   He had ADHD and "could never concentrate."   He alleged current problems with memory, concentration, reading, writing, and task completion.   Dr. Cole diagnosed ADHD, combined type; learning disorder, NOS; and major depressive disorder, recurrent, mild.   He also noted that plaintiff's intellectual functioning appeared to be in the borderline range,

14

and he recommended further evaluation.   He opined that plaintiff would not be able to manage his benefits if benefits were awarded.   (Tr. 647-651).

Dr. Ghalambor administered a lumber intra and periarticular facet injection at L5-S1 on October 12, 2010.   (Tr. 781-782).

Mr. McCabe saw Dr. Olivero in November 2010.   He had undergone an MRI which showed degeneration of the L5-S1 disc.   He was complaining of low back pain and pain in his left leg.   Dr. Olivero said that a fusion "might be helpful," but he did not do that kind of surgery.   (Tr. 745).   Plaintiff returned in March 2011, again complaining of low back pain and pain in the left leg.   (Tr. 744).   A repeat lumber MRI was done on April 11, 2011.   This showed minimal L5-S1 degenerative disc disease with no central spinal canal or foraminal stenosis.   (Tr. 738).   Dr. Olivero informed plaintiff that no surgery was indicated and he should see a pain management specialist.   Plaintiff asked to be referred to the Weber Clinic.   (Tr. 819).

On May 3, 2011, plaintiff's wife informed Dr. Olivero that the Weber Clinic would not see him.   She asked him to prescribe pain medication.   Dr. Olivero prescribed hydrocodone/acetaminophen, 70 tablets, with no refills.   (Tr. 818).

Plaintiff went to the emergency room at Richland Memorial Hospital for back pain on May 18, 2011.   He said that he had run out of hydrocodone 3 days ago. He and his wife expressed frustration that they were not able to find a local primary care physician who would accept the Illinois medical card, and had not been able to get into a pain clinic.   On exam, there was generalized diffuse tenderness over the lower lumbar region.   The doctor prescribed hydrocodone/acetaminophen,

Voltaren, and Flexeril, but informed plaintiff that he should establish care with a local doctor and that the emergency room would not continue to provide pain medications.  (Tr. 725-726).

Mrs. McCabe called Dr. Olivero on May 26, 2011, requesting a refill of pain medication.  Dr. Olivero refused.  His office suggested that plaintiff try the Sarah Bush pain treatment center.  (Tr. 817).  A few days later, Mrs. McCabe told Dr. Olivero's office that Sarah Bush would not do "chronic pain meds."  The doctor's staff recommended that plaintiff establish care with a primary care provider.  (Tr. 816).

Plaintiff went to the emergency room at St. Anthony Memorial Hospital after a crankcase slid off a jack and hit him in the head in August 2011.  (Tr. 777-778).

Plaintiff saw Dr. Saliba a few times between June 10, 2011 and August 8, 2011.  Dr. Saliba had previously prescribed hydrocodone/acetaminophen.  (Tr. 692-708).  On August 8, 2011, Dr. Saliba noted plaintiff was exhibiting drug seeking behavior and discussed with him a plan of decreasing his dosage of hydrocodone/acetaminophen.  (Tr. 690-693).

Mr. McCabe returned to the emergency room at Richland Memorial Hospital on August 25, 2011, complaining of severe low back pain.  He was again seen by Dr. Dirk Rosenberg.  He had been lifting a push lawnmower earlier that day and felt something pop in his back.   He said that he had run out of his pain medication. Mr. and Mrs. McCabe again said they were frustrated because they could not find a local doctor who would accept their medical card.  Exam showed diffuse tenderness over the lumbar region.  Plaintiff was neurologically grossly intact.

16

Deep tendon reflexes of the knees and ankles were diminished but equal. The doctor reviewed plaintiff's prescription history and found that he had obtained several prescriptions for hydrocodone/acetaminophen as well as Alprazolam from various practitioners in the last four months. He had filled a prescription for 100 hydrocodone/acetaminophen from Dr. Saliba on August 8, 2011, and had filled a prescription for 20 of the same medication from a Dr. Kabbes 4 days before that. Dr. Rosenberg again instructed plaintiff to establish care with a local doctor and told him that the emergency room would not provide pain medications. (Tr. 719-721)

Plaintiff saw Dr. Jeffrey Smith to establish care on September 2, 2011. He told Dr. Smith that he wanted to get pain medication and Xanax. (Tr. 712).

Dr. Vittal Chapa performed a second consultative physical exam on September 27, 2011. Plaintiff told him that he had back pain radiating down his legs. He said that he could not sit for long periods or walk for long distances. He used a cane that was self-prescribed. He also said that he loses control of his hands and drops things. On exam, he favored the right leg while walking but was able to walk 50 feet without the cane. The exam of his neck was "negative." He had a full range of motion of the cervical spine. Plaintiff did not want to remove his jeans for the exam, so it was unclear whether he had any muscle atrophy of the lower extremities. He appeared to have 4/5 strength in the right leg. Upper extremity strength was 5/5. He stated that he could not feel the pinprick sensation in the right leg. Knee and ankle reflexes were absent. There was no paravertebral muscle spasm. Lumbosacral flexion was limited to 70 degrees. Straight leg

17

raising while sitting was negative up to 70 degrees bilaterally.   Plaintiff complained of pain on the right at 20 degrees and on the left at 50 degrees in the supine positon. Plaintiff's handgrip was 5/5 bilaterally and he was able to perform fine and gross manipulations with both hands.   An x-ray of the right knee showed no obvious arthritic changes.   An x-ray of the lumbar spine showed multilevel degenerative changes with "somewhat more significant" findings at L5-S1 with "possible foraminal narrowing."   Dr. Chapa's diagnostic impression was chronic lumbosacral pain syndrome.   (Tr. 750-757).

Marilyn Marks Frey, Ph.D., performed a consultative psychological exam, including IQ testing, on October 31, 2011.   She noted that plaintiff walked with a cane and limped "badly."   Dr. Frey administered the Wechsler Adult Intelligence Scales-IV Edition ("WAIS-IV).   Mr. McCabe's' scores were Full Scale IQ of 70, Verbal Comprehension of 72, Perceptual Reasoning of 84, Working Memory of 69 and Processing Speed of 68.   She also administered the Wide Range Achievement Test-IV Edition.   Dr. Frey diagnosed   Mr. McCabe with Adjustment Disorder with Depressed Mood, Learning Disability (aphasic disorder, dyslexia type), and Borderline Intelligence Level.   She concluded that his "Adaptive functioning is poor and when one combines his cognitive level and learning disability with physical limitations Mr. McCabe is unable to work."   (Tr. 766-770).

Plaintiff was admitted to Good Samaritan Regional Health Hospital in Mount Vernon, Illinois, on February 23, 2012, following a myocardial infarction and cardiac arrest.   A cardiac catheterization was performed and a stent was inserted. He signed out against medical advice on February 25, 2012.   (Tr. 833-837).

18

Plaintiff was admitted to Deaconess Health System in Evansville, Indiana, on March 2, 2012, with chest pain.   An angiogram and angioplasty were performed. He was discharged on March 6, 2012.   (Tr. 866-902).

## Analysis

Plaintiff's first two points argue that the ALJ erred in not finding that he met a Listing.

A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled.   In order to be found presumptively disabled, the claimant must meet all of the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis."   20 C.F.R. §404.1525(d).   The claimant bears the burden of proving that she meets or equals a listed impairment.   *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

Mr. McCabe first argues that he met the requirements of Listing 12.05B or 12. 05C.   The pertinent requirements of those Listings are

> 12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant

work-related limitation of function.[5]

Plaintiff's argument as to 12.05B is a complete non-starter.   Both the ALJ and plaintiff misread Dr. Frey's report.   Citing generally to Exhibit 29F (Dr. Frey's report) the ALJ said that plaintiff's IQ scores ranged from 55 to 76.   In assessing whether plaintiff met Listing 12.05B, the ALJ said that plaintiff had "a valid verbal, performance, or full scale IQ of 59 or less.   (Tr. 372-373).   That is incorrect.   Dr. Frey wrote that plaintiff's results on the WAIS-IV ranged from 68-84.   The scores in the range of 55 to 76 were on the Wide Range Achievement Test-IV.   (Tr. 769).

The Wide Range Achievement Test-IV is not an IQ test.   Rather, it is a tool that provides "A quick measure of fundamental academic skills, helpful in diagnosing learning disabilities and determining instructional needs."   See, http://www.wpspublish.com/store/p/3098/wide-range-achievement-test-4-wrat4, visited on February 25, 2016.

Because there is no evidence that plaintiff had a valid verbal, performance, or full scale IQ of 59 or less, he does not meet the requirements of Listing 12.05B.

Listing 12.05C requires, first, a valid verbal, performance, or full scale IQ of 60 to 70.   Some of plaintiff's scores are in this range.   Section 12.00(C)(6)(c) directs that, where an IQ test such as those in the Wechsler series yields more than one IQ score, the lowest score should be used for purposes of Listing 12.05.   Plaintiff's lowest score on the WAIS-IV was 68, which satisfies the first requirement of 12.05C.   However, the first paragraph of 12.05 also requires evidence of

---

[5] Effective September 3, 2013, the term "intellectual disability" was substituted for the prior "mental retardation" in the Listings.   This was not a substantive change in the requirements of the relevant Listings.   This change is consistent with the terminology used in the DSM-5.   See, 78 Federal Register 148.   The Court uses the current terminology here.

"deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."

The requirement of onset before age 22 is intended to limit 12.05 to an "innate condition" as opposed to conditions caused by disease or accident suffered as an adult.   See, *Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007).   Deficits in adaptive functioning means the "inability to cope with the challenges of ordinary everyday life."   *Novy*, 497 F.3d at 710.   There is no requirement that an ALJ use a "a specific measurement method" to determine whether the claimant manifested a deficit in adaptive functioning before age 22.   *Charette v. Astrue*, 508 Fed. Appx. 551, 553 (7th Cir. 2013).

The ALJ considered whether plaintiff had manifested deficits in adaptive functioning before the age of 22.   He discussed plaintiff's school records, the primary evidence of plaintiff's condition before the age of 22, and noted that a teacher wrote that he was capable of getting better grades and understood what he needed to do, but he did not take advantage of opportunities to correct low grades and re-do failing work.   (Tr. 373).   Notably, those records indicate that plaintiff was placed in special education classes because he had ADHD.

Plaintiff argues that he has manifested deficits in adaptive functioning in a number of ways.   See, Doc. 17, pp. 9-11.   However, except for his school records, the evidence he cites all relates to his condition after the age of 22.   Plaintiff bears the burden of establishing that he meets the requirements of a Listing at step 2. *Filus*, 694 F.3d at 868; *Maggard*, 167 F.3d at 380.   Plaintiff has not done so with

respect to Listing 12.05.

Plaintiff also argues that he met the requirements of Listing 1.04A. The requirements of Listing 1.04A are:

> Disorders of the spine (e.g., herniated nucleus pulposus, ... degenerative disc disease ...vertebral fracture) resulting in compromise of a nerve root ... or the spinal cord.
>
> With
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

The ALJ said that plaintiff did not meet this Listing because "the evidence does not establish motor loss as evidence of nerve root compression in the spine...." (Tr. 371).   Later on in his decision, the ALJ discussed medical evidence indicating that plaintiff's neurological findings in his arms did not correlate to any given dermatome or nerve root.   (Tr. 377).   He also noted that a lumbar MRI done in April 2011 showed minimal degenerative disc disease at L5-S1 with no central spinal canal or foraminal stenosis.   (Tr. 379).

The Court agrees that the ALJ's discussion of Listing 1.04A was perfunctory. In discussing his RFC assessment, the ALJ acknowledged that an EMG study showed right-sided radiculopathy, and that this finding correlated with plaintiff's "intermittent gait and abnormal sensation findings."   He remarked that plaintiff's full strength and lack of atrophy "mitigate against a finding" that he meets 1.04. (Tr. 380).   However, 1.04A requires "motor loss (atrophy with associated muscle weakness or muscle weakness)."   The absence of atrophy is therefore not fatal.

The ALJ failed to discuss the fact that some weakness of the right leg was detected on more than one occasion.   He noted that Dr. Olivero detected sensory loss in the right leg in a stocking pattern, but did not relate that evidence to his discussion of 1.04A.   Further, he did not acknowledge that both consultative examiners detected positive straight leg raising.

This is not to say that the ALJ was required on this record to find that plaintiff meets the requirements of Listing 1.04A.   However, there is relevant evidence that was not discussed by the ALJ in this context.   While the Court acknowledges that the ALJ's decision must be read as a whole, the failure to explain why this relevant evidence did not establish that plaintiff meet Listing 1.04A leaves the Court unable to review the ALJ's decision in this regard.   "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).   See also, *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) ("[A] a denial of benefits cannot be sustained where an ALJ failed to articulate the bases of his assessment of a claimant's impairment.")

The Court also agrees that the ALJ erred in his consideration of Dr. Frey's opinion.

Dr. Frey did not treat plaintiff.   Rather, she examined him at the request of the agency in October 2011.   Dr. Frey concluded that plaintiff's "[a]daptive functioning is poor and when one combines his cognitive level and learning disability with physical limitations Mr. McCabe is unable to work."   (Tr. 766-770).

23

"[R]ejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled, as happened here, can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014).   ALJ Janney did not give a good explanation here.

The ALJ said that he rejected Dr. Frey's opinion that plaintiff's adaptive functioning was poor because it was inconsistent with the evidence.   The ALJ cited two categories of evidence.   First, he relied on the fact that plaintiff was able to adapt to 2 different industries (soda bottling plant and carpet installation). Secondly he noted that, after his alleged date of disability, plaintiff lifted a mower, worked with a crank case and jack, worked on his house, and used a drill.   (Tr. 379).

Plaintiff's ability to adapt to working in 2 different industries might show that he did not have poor adaptive functioning while he was working.   However, plaintiff began working in the carpet installation industry in 1998, so any vocational adaptation presumably occurred around that time.   He had not worked since April 2005.   Dr. Frey was assessing his condition as of October 2011.   Adaptive functioning involved in adjusting to working in a new industry has little relevance to his condition at the time of Dr. Frey's examination.   And, the activities cited by the ALJ simply do not illustrate adaptive functioning.   As the ALJ himself acknowledged, "this evidence is mitigated by the fact that each of them led him to seek medical care."   (Tr. 379).   The fact that Mr. McCabe hurt himself while trying to do things that he was physically unable to do hardly demonstrates good adaptive

functioning.

The Commissioner argues that Dr. Frey's opinion was not entitled to "controlling weight" because she was not a treating source.   Doc. 26, p. 15.   She is correct, but that does not relieve the ALJ of his responsibility to give a "good explanation" for his decision to reject her opinion that plaintiff is disabled. *Beardsley, ibid*.   She points to his ability to adapt while he was working, but, again, that was years before Dr. Frey examined plaintiff.   She also points to plaintiff's attempts to do work around his house, as cited by the ALJ, but fails to meaningfully grapple with the fact that each of these instances resulted in plaintiff having to seek medical care.

Because of the ALJ's errors, this case must be remanded.   The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. McCabe was disabled during the relevant period or that he should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## <u>Conclusion</u>

The Commissioner's final decision denying Tommy L. McCabe's   application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

DATE:   **February 26, 2016.**




<u>**s/ Clifford J. Proud**</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**